FILED by KS D.C.

May 25, 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**21-20321-CR-ALTONAGA/TORRES**

Case No. _____

18 U.S.C. § 371
42 U.S.C. § 1320a-7b(b)(1)(B)
42 U.S.C. § 1320a-7b(b)(2)(B)
18 U.S.C. § 2
18 U.S.C. § 982(a)(7)

UNITED STATES OF AMERICA

vs.

MICHAEL STEIN and
LEONEL PALATNIK,

  Defendants.

_____/

**INDICTMENT**

The Grand Jury charges that:

**GENERAL ALLEGATIONS**

At all times material to this Indictment:

**The Medicare Program**

1.  The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2. Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program" as defined by Title 42, United States Code, Section 1320a-7b(f).

3. Medicare covered different types of benefits, which were separated into different program "parts." Medicare "Part A" covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare "Part B" was a medical insurance program that covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits, minor surgical procedures, and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

4. Physicians, clinics, and other health care providers, including laboratories, that provided services to beneficiaries were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

5. A Medicare claim was required to contain certain important information, including: (a) the beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other health care provider, as well as a unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). The claim form could be submitted in hard copy or electronically.

**Part B Coverage and Regulations**

6. CMS acted through fiscal agents called Medicare administrative contractors ("MACs"), which were statutory agents for CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries. The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

7. Novitas Solutions, Inc. ("Novitas") was the MAC for consolidated Medicare jurisdictions JH and JL, which included Texas, among other states.

8. To receive Medicare reimbursement, providers had to make appropriate application to the MAC and execute a written provider agreement. The Medicare provider enrollment application, CMS Form 855B, was required to be signed by an authorized representative of the provider. CMS Form 855B contained a certification that stated:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

9. CMS Form 855B contained additional certifications that the provider "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare" and "will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

10. Medicare Part B paid for claims only if the items or services were medically reasonable, medically necessary for the treatment or diagnosis of the patient's illness or injury, documented, and actually provided as represented to Medicare. Medicare would not pay for items or services that were procured through kickbacks and bribes.

### Genetic Testing

11. Genetic testing refers to laboratory tests that used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain medical conditions in the future, or to assist in the treatment or management of these conditions.

12. Cancer genetic tests ("CGx tests") were designed to detect mutations that could lead to a higher risk of developing cancer or to assist in the treatment of an existing cancer; cardiac genetic tests ("Cardio tests") were designed to detect mutations that could lead to a higher risk of developing certain cardiac conditions; and pharmacogenetic tests ("PGx tests") were designed to assess how genes would affect a person's response to certain medications, such as medications taken for depression. None of these forms of genetic testing was a method of diagnosing, in the first instance, whether an individual had cancer or heart disease.

13. To conduct genetic testing, a laboratory must have obtained a DNA sample from the patient. Such samples were typically obtained from the patient's saliva by using a cheek (buccal) swab to collect sufficient cells to provide a genetic profile. The genetic sample was then submitted to the laboratory to conduct a genetic test.

14. DNA samples were submitted along with requisitions that identified, among other things, the patient, the patient's insurance, and the specific test to be performed, such as a comprehensive panel of genes to test for risks of multiple cancers. In order for laboratories to submit claims to Medicare for genetic tests, the requisitions had to be approved by a physician or other authorized medical professional who attested to the medical necessity of the test. Such requisitions were known as "doctors' orders."

### Medicare Coverage for Genetic Testing

15. Medicare did not cover diagnostic testing, including genetic testing, that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." Title 42, United States Code, Section 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." Title 42, Code of Federal Regulations, Section 411.15(a)(1). Among the statutory exceptions Medicare covered were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

16. If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a), provided that "[a]ll diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

### Telemedicine

17. Telemedicine provided a means of connecting patients to doctors by using telecommunications technology, such as the internet or a telephone, to interact with a patient. Telemedicine companies provided telemedicine services, or telehealth services, to individuals by hiring doctors and other health care providers.

5

18. Medicare Part B covered expenses for specific telehealth services if certain requirements were met. These requirements included that (a) the beneficiary was located in a rural or health professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was in a practitioner's office or a specified medical facility—not at a beneficiary's home—during the telehealth service with a remote practitioner. In or around March 2020, in response to the COVID-19 pandemic and in order to enable access to care during the public health emergency, some of these requirements were amended temporarily to, among other things, cover telehealth services for certain office and hospital visits, even if the beneficiary was not located in a rural area or a health professional shortage area and even if the telehealth services were furnished to beneficiaries in their home.

### The Defendants and Related Companies

19. Defendant **MICHAEL STEIN**, a resident of Palm Beach County, owned and controlled 1523 Holdings LLC and other companies, as further described herein.

20. Defendant **LEONEL PALATNIK**, a resident of Palm Beach County, Florida, co-owned Panda Conservation Group, LLC ("Panda") through a holding entity he controlled, Anucan, LLC. **PALATNIK**, along with the other co-owners of Panda, controlled and operated Panda and its subsidiary entities.

21. Panda was a company organized and existing under the laws of Texas, with a mailing address located at 440 South Federal Highway, Suite 207, Deerfield Beach, FL 33441. Panda owned multiple laboratories engaging in CGx and Cardio genetic testing, including Amerihealth Laboratory, LLC ("Amerihealth") and MP3 Labs, Inc. ("MP3").

22. To market its services, Panda used a call center operating under the name "Health Awareness Project," or "HAP," located at 6451 North Federal Highway, Suite 1003, Fort Lauderdale, FL 33308.

23. Amerihealth was a clinical laboratory located at 4225 Office Parkway, Suite 110, Dallas, TX 75204. In or around May 2019, **LEONEL PALATNIK** signed and submitted a Medicare Enrollment Application which listed **PALATNIK** as Amerihealth's sole director/officer, partner, authorized official, and owner. Panda and its owners acquired Amerihealth on or about January 1, 2020. **PALATNIK** and others controlled and operated Amerihealth.

24. MP3 was a clinical laboratory located at 1500 I-35 W, Suite 120, Denton, Texas 76207. MP3 enrolled as a Medicare provider in or around September 2015. Panda and its owners acquired MP3 on or about January 1, 2020. **LEONEL PALATNIK** and others controlled and operated MP3.

25. Amerihealth and MP3 are collectively referred to herein as the "Laboratories."

26. 1523 Holdings, LLC ("1523"), d/b/a Inwerx, was a Florida company located at 2000 N. 29th Ave. No. 301, Hollywood, FL 33020. **MICHAEL STEIN** was the sole manager and registered agent for 1523, and controlled and operated 1523.

27. Growthlogix, LLC ("Growthlogix"), d/b/a Digital Mayo, LLC, was a Florida company located at 2000 N. 29th Ave. No. 301, Hollywood, FL 33020, the same address listed for 1523. **MICHAEL STEIN** was Growthlogix's registered agent. **STEIN** controlled and operated Growthlogix.

## COUNT 1
### Conspiracy to Defraud the United States and Pay and Receive Kickbacks
### (18 U.S.C. § 371)

1. The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2. From in or around March 2019, and continuing through in or around March 2021, the exact dates being unknown to the Grand Jury, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**MICHAEL STEIN and
LEONEL PALATNIK,**

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with each other, and with others known and unknown to the Grand Jury, to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the United States government and any of its departments or agencies, namely, HHS in its administration and oversight of the Medicare program, and to commit certain offenses against the United States, that is:

a. to violate Title 42, United States Code, Section 1320a-7b(b)(1)(B) by soliciting and receiving any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check and wire transfer, in return for purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and ordering of any good, facility, service, and item, for which payment may be made in whole and in part by a Federal health care program, that is, Medicare; and

b. to violate Title 42, United States Code, Section 1320a-7b(b)(2)(B), by offering and paying any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check and wire transfer, to a person to induce such person to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering of any good, facility, service, and item, for which payment may be made in whole and in part by a Federal health care program, that is, Medicare.

### Purpose of the Conspiracy

3. It was a purpose of the conspiracy for the defendants and their co-conspirators to unjustly enrich themselves by, among other things: (a) offering, paying, soliciting, and receiving kickbacks and bribes in exchange for referring and arranging for the ordering of fraudulent genetic testing orders to the Laboratories; (b) submitting and causing the submission of false and fraudulent claims to Medicare for genetic testing that was procured through illegal kickbacks and bribes; (c) concealing the kickbacks and the submission of false and fraudulent claims to Medicare; and (d) diverting kickbacks and fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the conspiracy.

### Manner and Means of the Conspiracy

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things:

4. **LEONEL PALATNIK** and others created and/or controlled Panda and the Laboratories.

5. **LEONEL PALATNIK** and his co-conspirators falsely certified to Medicare that they and the Laboratories would comply with all Medicare rules and regulations and federal laws, including the Anti-Kickback Statute, the requirement to not knowingly present or cause to be presented a false and fraudulent claim for payment to Medicare, and the requirement to not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

6. **LEONEL PALATNIK** and his co-conspirators obtained access to thousands of Medicare beneficiaries' insurance information and DNA material by causing them to be targeted with deceptive marketing campaigns, including online advertising and telemarketing, that promoted genetic testing.

7. **LEONEL PALATNIK** and his co-conspirators offered and paid illegal kickbacks and bribes to **MICHAEL STEIN**, through his entity 1523, in exchange for his arranging for telemedicine providers to order genetic testing for Medicare beneficiaries.

8. **MICHAEL STEIN**, through his entities 1523, Inwerx, and Growthlogix, and his co-conspirators offered and paid, and caused to be paid, illegal kickbacks and bribes to health care providers in the form of referrals of Panda-recruited patients, in exchange for the health care providers ordering medically unnecessary genetic testing. In so doing, **STEIN, LEONEL PALATNIK**, and their co-conspirators exploited pandemic related programs that were designed to enable needed access to care.

9. **LEONEL PALATNIK, MICHAEL STEIN**, and their co-conspirators provided, or caused to be provided, confidential Medicare beneficiary information to health care providers working, directly or indirectly, for 1523, Inwerx, and Growthlogix, for the purpose of purportedly conducting telehealth consultations and ordering genetic testing.

10. **LEONEL PALATNIK, MICHAEL STEIN**, and their co-conspirators caused health care providers to order genetic testing for Medicare beneficiaries that was procured through the payment of kickbacks and bribes, medically unnecessary, ineligible for Medicare reimbursement, and not provided as represented. In many instances, the health care providers had no prior relationship with the beneficiaries, were not treating the beneficiaries for any medical condition, did not use the test results in the treatment of the beneficiaries, and often did not conduct a telemedicine consultation as represented to Medicare.

11. The health care providers who ordered genetic testing for the Laboratories were required to sign a certification on each order that stated "I am the patient's treating physician and this order is based upon Medicare's requirement that the testing is not ordered for the purposes of screening but for the diagnosis and treatment of the patient's individual medical condition." **LEONEL PALATNIK, MICHAEL STEIN**, and their co-conspirators knew this was false.

12. **LEONEL PALATNIK, MICHAEL STEIN**, and their co-conspirators concealed and disguised the scheme and the payment and receipt of illegal kickbacks and bribes by executing a sham contract, labeling payments as purported "consultation and IT services," and creating and maintaining false and fraudulent documents.

13. **LEONEL PALATNIK** and his co-conspirators concealed and disguised the scheme and the payment and receipt of illegal kickbacks and bribes by failing to disclose the persons with ownership and/or managing control of medical providers, including MP3, to Medicare.

14. During the COVID-19 public health emergency, **LEONEL PALATNIK**, **MICHAEL STEIN**, and their co-conspirators caused the Laboratories to submit, and cause the submission of, an amount in excess of approximately $73 million in false and fraudulent claims to Medicare for genetic tests that were obtained through kickbacks and bribes, medically unnecessary, ineligible for reimbursement, and not provided as represented. Medicare paid the Laboratories approximately in excess of $51 million for these claims.

15. During the COVID-19 public health emergency, **LEONEL PALATNIK**, **MICHAEL STEIN**, and their co-conspirators caused providers to submit, and cause the submission of, an amount in excess of approximately $1 million in false and fraudulent claims to Medicare for telemedicine consultations that were obtained through kickbacks and bribes, medically unnecessary, ineligible for reimbursement, and not provided as represented. Medicare paid the providers approximately in excess of $550,000 for these claims.

16. **LEONEL PALATNIK, MICHAEL STEIN**, and their co-conspirators used the fraud proceeds derived from the Laboratories to benefit themselves and others, and to further the conspiracy.

## OVERT ACTS

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one of the co-conspirators committed and caused to be committed, in the Southern District of Florida and elsewhere, at least one of the following overt acts, among others:

1. On or about March 30, 2020, **MICHAEL STEIN** emailed **LEONEL PALATNIK** a draft of a Master Services Agreement between Panda and 1523, stating "I have . . . removed any references to telemed/doctors."

2. On or about May 27, 2020, **MICHAEL STEIN** emailed **LEONEL PALATNIK** and others at Panda, stating "As per Leo's request, I have modified the [Master Services Agreement] to reflect $50,000 per month."

3. On or about July 1, 2020, **LEONEL PALATNIK, MICHAEL STEIN**, and their co-conspirators executed a Master Services Agreement between Panda and 1523, wherein Panda agreed to pay $50,000 per month for purported "consultation and IT services."

4. On or about July 16, 2020, **PALATNIK** and his co-conspirators transferred or caused to be transferred approximately $25,000 from an account ending in 0676 in the name of Panda at MapleMark Bank to an account in the name of 1523 ending in 5987 at Chase Bank in exchange for **STEIN**'s arranging for telemedicine providers to order genetic testing for Medicare beneficiaries.

5. On or about July 27, 2020, **PALATNIK** and his co-conspirators transferred or caused to be transferred approximately $25,000 from an account ending in 0676 in the name of Panda at MapleMark Bank to an account in the name of 1523 ending in 5987 at Chase Bank in exchange for **STEIN**'s arranging for telemedicine providers to order genetic testing for Medicare beneficiaries.

6. On or about September 30, 2020, **PALATNIK** and his co-conspirators transferred or caused to be transferred approximately $35,000 from an account ending in 2850 in the name of Panda at Vista Bank to an account in the name of 1523 ending in 5987 at Chase Bank in exchange for **STEIN**'s arranging for telemedicine providers to order genetic testing for Medicare beneficiaries.

7. On or about November 6, 2020, **PALATNIK** and his co-conspirators transferred or caused to be transferred approximately $100,000 from an account ending in 2850 in the name

of Panda at Vista Bank to an account in the name of 1523 ending in 5987 at Chase Bank in exchange for **STEIN**'s arranging for telemedicine providers to order genetic testing for Medicare beneficiaries.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 2-5
### Solicitation and Receipt of Kickbacks in Connection with a Federal Health Care Program
### (42 U.S.C. § 1320a-7b(b)(1)(B))

1. The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2. On or about the dates set forth below as to each count, in Broward County, in the Southern District of Florida, and elsewhere, the defendant,

**MICHAEL STEIN,**

did knowingly and willfully solicit and receive any remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part by a Federal health care program, that is, Medicare, as set forth below:

| Count | Approximate Date | Originating Account | Payee | Approximate Amount |
|---|---|---|---|---|
| 2 | 7/16/20 | Panda Conservation Group, LLC – MapleMark Bank No. ****0676 | 1523 Holdings, LLC – Chase Bank No. ******5987 | $25,000 |
| 3 | 7/27/20 | Panda Conservation Group, LLC – MapleMark Bank No. ****0676 | 1523 Holdings, LLC – Chase Bank No. ******5987 | $25,000 |

| Count | Approximate Date | Originating Account | Payee | Approximate Amount |
|---|---|---|---|---|
| 4 | 9/30/20 | Panda Conservation Group, LLC – Vista Bank No. *******2850 | 1523 Holdings, LLC – Chase Bank No. ******5987 | $35,000 |
| 5 | 11/06/20 | Panda Conservation Group, LLC – Vista Bank No. *******2850 | 1523 Holdings, LLC – Chase Bank No. ******5987 | $100,000 |

In violation of Title 42, United States Code, Section 1320a-7b(b)(1)(B), and Title 18, United States Code, Section 2.

### COUNTS 6-9
### Offer and Payment of Kickbacks in Connection with a Federal Health Care Program
### (42 U.S.C. § 1320a-7b(b)(2)(B))

1. The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2. On or about the dates set forth below as to each count, in Broward County, in the Southern District of Florida, and elsewhere, the defendant,

**LEONEL PALATNIK,**

did knowingly and willfully offer and pay any remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, as set forth below, to a person, to induce such person to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole or in part by a Federal health care program, that is, Medicare:

| Count | Date | Originating Account | Payee | Amount |
|---|---|---|---|---|
| 6 | 7/16/20 | Panda Conservation Group, LLC – MapleMark Bank No. ****0676 | 1523 Holdings, LLC – Chase Bank No. ******5987 | $25,000 |
| 7 | 7/27/20 | Panda Conservation Group, LLC – MapleMark Bank No. ****0676 | 1523 Holdings, LLC – Chase Bank No. ******5987 | $25,000 |
| 8 | 9/30/20 | Panda Conservation Group, LLC – Vista Bank No. ******2850 | 1523 Holdings, LLC – Chase Bank No. ******5987 | $35,000 |
| 9 | 11/06/20 | Panda Conservation Group, LLC – Vista Bank No. ******2850 | 1523 Holdings, LLC – Chase Bank No. ******5987 | $100,000 |

In violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B), and Title 18, United States Code, Section 2.

## FORFEITURE ALLEGATIONS
### (18 U.S.C. § 982(a)(7))

1.  The allegations contained in this Indictment are hereby incorporated by reference as if set forth fully herein for alleging criminal forfeiture to the United States of certain property in which the defendants, **MICHAEL STEIN** and **LEONEL PALATNIK**, have an interest.

2.  Upon conviction of a violation of a federal health care offense, as defined by Title 18, United States Code, Section 24 and as alleged in this Indictment, the defendant so convicted shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such violation.

3.       The property which is subject to criminal forfeiture includes, but is not limited to, the following: A sum of money equal in value to the property that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the federal health care offenses alleged in this Indictment, for which the United States will seek entry as a forfeiture money judgment against each defendant upon conviction as part of their respective sentence.

All pursuant to Title 18, United States Code, Section 982(a)(7), and the procedures outlined at Title 21, United States Code, Section 853, as made applicable by Title 18, United States Code, Section 982(b).

A TRUE BILL

_____
FOREPERSON

_____
JUAN ANTONIO GONZALEZ
ACTING UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

DANIEL KAHN
ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION

ALLAN MEDINA
DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

_____
LIGIA MARKMAN
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Ave., N.W.
Washington, D.C. 20005
Phone: (202) 794-2219
Email: ligia.markman@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

MICHAEL STEIN, et al.,

_____ Defendants/

CASE NO._____

**CERTIFICATE OF TRIAL ATTORNEY\***

**Superseding Case Information:**

**Court Division:** (Select One)

☑ Miami  ☐ Key West  ☐ FTL
☐ WPB    ☐ FTP

New defendant(s)  ☐ Yes  ☐ No
Number of new defendants  _____
Total number of counts  _____

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.
2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.
3. Interpreter: (Yes or No) **No**
   List language and/or dialect _____
4. This case will take **15** days for the parties to try.
5. Please check appropriate category and type of offense listed below:

   (Check only one)
   I   0 to 5 days     ☐
   II  6 to 10 days    ☐
   III 11 to 20 days   ☑
   IV  21 to 60 days   ☐
   V   61 days and over ☐

   (Check only one)
   Petty       ☐
   Minor       ☐
   Misdemeanor ☐
   Felony      ☑

6. Has this case previously been filed in this District Court? (Yes or No) **No**
   If yes: Judge _____ Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter? (Yes or No) **No**
   If yes: Magistrate Case No. _____
   Related miscellaneous numbers: _____
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the District of _____
   Is this a potential death penalty case? (Yes or No) **No**

7. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia O. Valle)? (Yes or No) **No**
8. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)? (Yes or No) **No**
9. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)? (Yes or No) **No**

_____
LIGIA MARKMAN
DOJ Trial Attorney
Court ID No.    A5502656

\*Penalty Sheet(s) attached

REV 3/19/21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**PENALTY SHEET**

**Defendant's Name:**      MICHAEL STEIN

**Case No:** _____

Count #: 1

Title 18, United States Code, Section 371

Conspiracy to Defraud the United States and to Pay and Receive Illegal Kickbacks

**\*Max Penalty**: Five (5) years' imprisonment

Counts #: 2 – 5

Title 42, United States Code, Section 1320a-7b(b)(1)(B)

Solicitation and Receipt of Kickbacks in Connection with a Federal Health Care Program

**\*Max Penalty**: Ten (10) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:**    **LEONEL PALATNIK**

**Case No:** _____

Count #: 1

Title 18, United States Code, Section 371

Conspiracy to Defraud the United States and to Pay and Receive Illegal Kickbacks

**\*Max Penalty:** Five (5) years' imprisonment

Counts #: 6 – 9

Title 42, United States Code, Section 1320a-7b(b)(2)(B)

Payment of Kickbacks in Connection with a Federal Health Care Program

**\*Max Penalty:** Ten (10) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**