**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-CR-20321-ALTONAGA**

**UNITED STATES OF AMERICA**

**v.**

**MICHAEL STEIN,**

                **Defendant.**

_____/

**UNITED STATES' SENTENCING MEMORANDUM AND**
**RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PSR**

The United States of America, through undersigned counsel, respectfully submits this Sentencing Memorandum in advance of the sentencing for Defendant Michael STEIN.  This Sentencing Memorandum also responds to the Defendant's Objections to the Sentencing Guidelines calculations[1], as set forth by U.S. Probation in the Pre-Sentence Investigation Report, [D.E. 297, hereinafter the "PSR"].  For the reasons set forth below, the Court should adopt the findings of the U.S. Probation Office with regard to the calculation of the United States Sentencing Guidelines (the "Guidelines") range, and Defendant's Objections to the PSR's calculation should be disregarded.  Defendant's crime resulted in over $90 million in false and fraudulent claims submitted to Medicare, and over $60 million paid.  Defendant was integral to the conspiracy; without his work recruiting telemedicine providers to participate in the scheme by authorizing genetic tests and referring orders to Panda's laboratories in exchange for kickbacks, the scheme could not have worked.  This criminal conduct warrants a substantial custodial sentence.

---

[1]     Defendant's Objections to the PSR were sent to the Probation Office directly, and were not filed on the docket.  For ease of reference, the Government will provide a courtesy copy of Defendant's PSR Objections to the Court via email.

1

## PROCEDURAL AND FACTUAL BACKGROUND

On April 10, 2023, the day his trial was scheduled to begin, Defendant pled guilty to one count of conspiracy to defraud the United States and to pay and receive health care kickbacks. D.E. 287 (the "Plea Agreement").  In the Plea, the Government and Defendant agreed that the base offense level was eight (8) pursuant to U.S.S.G. § 2B4.1(a).  The parties did not agree on the applicable amounts for loss, restitution, forfeiture, or any other enhancements that may be applicable to Defendant's conduct.

As factual support for his plea, Defendant admitted in a signed factual proffer, which the Court reviewed with him at the change of plea hearing, that, beginning in or around April 2020, he entered into an agreement with Panda Conservation Group, LLC ("Panda") to receive $50,000 each month for, among other things, recruiting and onboarding telehealth practitioners to the Panda platform so that they could do telehealth consultations for genetic testing.  D.E. 288, p. 2 (the "Factual Basis").  Defendant acknowledged that he had recruited a Nurse Practitioner, Elizabeth Hernandez, to do this work, and that she approved genetic testing for thousands of patients.  *Id.* Finally, he admitted that, in January 2021, he knowingly and willfully requested remuneration in the amount of $50,000 after knowing Hernandez had been terminated by Panda for fraudulent billing.  *Id.* at pp. 2–3.

On May 16, 2023, the Pre-Sentence Report ("PSR") was filed.  D.E. 297.  The PSR determined that Defendant was responsible for a loss of $61,314,953.87, the amount Medicare paid from April 2020 to December 2020 for fraudulent genetic tests authorized by providers recruited by Defendant to authorize such tests for Panda.  PSR at ¶ 66.  The PSR found that, as a result of this loss, Defendant's offense level should be increased by 22, for a total offense level of 28.  *Id.* at ¶¶ 66, 73.

On June 6, 2023, Defendant entered a letter objecting to several portions of the PSR (the "Objections").  In his Objections, Defendant contends that his loss should be zero, because he only knowingly solicited a kickback on January 2021, at which point Panda was no longer using providers he had recruited to authorize their claims.  For the reasons set forth below, which the Government will expand on at sentencing, Defendant's contention is unsupported by the evidence and his Objections to the PSR should be disregarded.

## ARGUMENT

### I.    The Court Should Adopt the PSR's Guidelines Calculation.

As set forth below, the Government agrees with the U.S. Probation Department's Guidelines Calculations in the PSR, which is summarized below:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2B1.1(a)(1)) | +8 |
| Loss: Greater than $25 million but less than $65 million (U.S.S.G. §§ 2B4.1(b)(1)(B) and 2B1.1(b)(1)(L)) | +22 |
| Acceptance of Responsibility (U.S.S.G. § 3E1.1(a)) | -2 |
| **TOTAL OFFENSE LEVEL** | **28** |
| **SENTENCING RANGE** | **78-97 months (60 months statutory maximum)** |

Defendant takes issue with the loss calculation in the PSR, and argues that he should be held responsible for zero loss, as he has only admitted to knowingly soliciting a kickback in January 2021, after Panda had stopped billing Medicare for claims authorized by the providers he had recruited.  At sentencing, the Government intends to introduce evidence that will show Defendant knew from the inception of the conspiracy that his actions would cause fraudulent billings to Medicare, and is therefore responsible for the entire loss incurred during the relevant period.

3

## II.      The PSR Accurately Sets Out the Loss Amount.

In a kickback conspiracy, loss is "the greater of the value of the bribe or the improper benefit to be conferred," which, in this case, is the amount paid by Medicare for the fraudulent claims.  U.S.S.G. at § 2B4.1.  The Government has the burden of proving the loss amount by a preponderance of the evidence, which must be reliable and specific.  *United States v. Medina*, 485 F. 3d 1291, 1304 (11th Cir. 2007).  The Court "is in a unique position to assess the evidence and estimate loss based upon that evidence," so its "loss determination is entitled to appropriate deference."  *United States v. Campbell*, 765 F. 3d 1291, 1301 (11th Cir. 2014) (quoting § 2B1.1 cmt. n. 3(C)).[2]

From April 2020 to December 2020, Panda contracted with Defendant to recruit and onboard telemedicine doctors.  Factual Proffer, p. 2.  Defendant's co-conspirator Gustavo Geraldes testified in his deposition on May 24, 2023, that Panda paid Defendant to recruit telemedicine providers who would sign genetic testing for Panda's laboratories.  Geraldes Dep. 81:25, 82:1–3, attached as Exhibit 1.  Defendant maintains that, until approximately November 2020, he believed these providers—in particular Elizabeth Hernandez, who authorized approximately 71% of Panda's tests during this period—were conducting appropriate medical necessity consultations with the patients prior to authorizing their tests, and that he is therefore not responsible for any loss they caused.  Defendant's contention is irrelevant to the loss calculation, and belied by the evidence.

Between April 2020 and December 2020, Defendant solicited and accepted a kickback each time Panda paid him $50,000 per month to arrange for telemedicine providers to authorize

---

[2]      The Court can "base its loss determination on factual findings derived from, among other things, evidence heard during trial, undisputed statements in the PSI, or evidence presented during the sentencing hearing."  *United States v. Bradley*, 644 F. 3d 1213, 1290 (11th Cir.) (quotation omitted).

its genetic tests.  Defendant also offered and paid kickbacks to those providers, in the form of access to Panda's captive patient population and the opportunity to bill Medicare for consultations with those patients, in order to induce them to refer those tests exclusively to Panda's laboratories. This would be true even if Defendant believed the providers he recruited were conducting appropriate medical necessity consultations with each and every patient, because he was still being paid to arrange for those providers to refer orders to Panda's laboratories.  However, the evidence, which will be discussed in detail at the upcoming sentencing hearing, shows that Defendant knew very early on that this was simply not true, and thus that none of these tests were justified.

1. **Defendant Solicited and Received Kickbacks to Recruit Telemedicine Providers to Authorize Genetic Tests Billed to Medicare During the Entire Conspiracy Time Period.**

Even if the providers recruited by Defendant had, in fact, conducted appropriate medical necessity determinations for each and every beneficiary whose tests they authorized, every single monthly payment of $50,000 that Defendant received from Panda from April 2020 to December 2020 would still be a kickback paid to him in exchange for his work arranging for those providers to refer genetic testing orders to Panda, and all of the resulting orders would be for genetic tests fraudulently procured by kickbacks.  There is no factual dispute that STEIN was paid, on average, $50,000 per month, and that he was paid this money for arranging for telemedicine providers to authorize Panda's genetic tests.

Indeed, as acknowledged by Geraldes, Panda would not have continued to pay Defendant if he had not recruited providers for Panda that were willing to authorize genetic testing orders and refer those orders exclusively to Panda's laboratories.   Geraldes Dep. 151:7–25, 152:1–5. Defendant solicited and accepted multiple kickbacks, totaling $400,000 over eight months, knowing that he was being paid to arrange for telemedicine providers to ultimately order genetic

testing that would be billed to Medicare by Panda's laboratories.  Exhibit 2[3] (GX 137 - Summary of Wire Transfers from Panda Conservation Group, LLC to 1523 Holdings LLC April 2020– December 2020); Exhibit 3 (GX 138 - Summary of Monthly Payments from Panda Conservation Group, LLC to 1523 Holdings, LLC April 2020–December 2020).

Moreover, Defendant himself admitted to his co-conspirator, Geraldes, that Defendant understood his job was to get providers to authorize orders.  During his deposition, Geraldes testified that he spoke to Defendant on December 15, 2020, and took contemporaneous notes of that conversation.  Geraldes testified that Defendant told him he would question and ultimately "remove" providers who "decline[d] tons of tests," and that a provider who "said they are not going to be TOLD how to do their JOB" was not a "right fit."  Geraldes Dep. 143:12–25, 144:1– 15; *see also* Exhibit 4 (GX 722 - 2020.12.10 G. Geraldes Notes of Call with M. Stein).

The minimal consulting and IT services Defendant provided to Panda did not remotely justify a payment of $50,000 per month.  The 2020 contract between Defendant's company, 1523 Holdings, LLC ("1523 Holdings"), and Panda, which stated he was expected to mainly provide IT work, was a sham designed to hide his crimes.  Defendant was paid to find telemedicine providers who would authorize genetic tests.  If he ceased to do that, he would not be paid.  Moreover, given that Nurse Practitioner Elizabeth Hernandez authorized 70% of Panda's genetic tests, and was authorizing such tests from the inception of the scheme, it is evident that what Defendant actually did for his monthly $50,000 was to identify, recruit, and liaise with Hernandez, Panda's preferred

---

[3]     Exhibits 2-20 to this Memorandum are documents that the Government intends to introduce into evidence at the sentencing hearing.  In an effort to streamline the sentencing, the Government provided the defense a list of all of the exhibits we intend to introduce at sentencing on June 13, including those cited in this Memorandum, and the defense has indicated they have no objection to pre-admitting them.  The Government will provide these exhibits to the Court via email before the hearing (copying defense counsel), but will only file them on the docket (with redactions, if necessary) if/when they are formally admitted at the sentencing hearing.

provider.  That's it.  Defendant did not earn $50,000 each month based on the market rate for his "IT services"; he was little more than a recruiter who recruited a single prolific provider, for which he was handsomely rewarded.

**2. Defendant Knew Elizabeth Hernandez, Who Authorized Over 70% of Panda's Claims, Was Authorizing Orders Without Calling Patients and Without Regard for Medical Necessity.**

Defendant recruited Hernandez and was the only person associated with the scheme who communicated with her.  He accessed and reviewed data that tracked exactly how many patients she "claimed" and how quickly she authorized her orders.  As a result, he knew better than anyone what she was doing, and what she failed to do.  Thus, STEIN knew of the fraud early on in the charged scheme.

Several pieces of evidence show Defendant was aware that Hernandez was not calling patients, much less making an appropriate medical necessity determination, prior to authorizing their genetic tests.  Pursuant to his proffer agreement, Defendant provided the Government with a screenshot of text messages between Defendant and Panda co-owner Christopher Hutson.[4]  In the text conversation, which dates from some time before April 21, 2020—the date is not visible on the screenshot—Hutson writes "complaince[sic] department is saying that Hernandez needs to slow down. They want to make sure that one doctor doesn't have 1,0000's[sic] of reqs with us." Exhibit 5 (GX 750 - 2020.04 Text Messages Between M. Stein and C. Hutson).   Defendant responds "Agreed. I spoke to her this morning." *Id.*  Hutson then writes "They don't want 1 doctor to have more than 25 percent." *Id.*  Thus, within a month of the start of Defendant's work for

---

[4]      The proffer agreement permits the Government to use evidence provided by the Defendant to "rebut any evidence or arguments offered by or on behalf of [Defendant] . . . at any stage of the criminal prosecution (including . . . sentencing)."  In his Objections to the PSR, Defendant argues that he did not learn about improper billing until the end of the conspiracy period, when Panda terminated Hernandez for fraudulent billing. *See, e.g.* Objections at p. 12.  The Government is permissibly using Defendant's proffer-protected evidence to rebut that argument.

Panda in April 2020, Defendant was already aware of concerns about Hernandez' volume and ordering speed.

By June 2020, as shown by emails sent by the Defendant himself, which the Government obtained via search warrant, Defendant had access to reports from Panda's customer relationship management portal, Zoho, that showed that Elizabeth Hernandez was authorizing dozens of orders within minutes, and could not have had enough time to call the patients, let alone conduct a meaningful consultation with all of them, prior to authorizing their orders.  For example, on June 7, 2020, Defendant emailed a report that showed that Hernandez had signed 212 orders between June 2 and June 3.  Exhibits 6 and 7, (GX 902A and GX 902 - 2020.06.07 Email from M. Stein to A.M. re: Backlog Spreadsheet and Attached Spreadsheet).  Defendant's text conversations with Hernandez also show that between July and October 2020 she asked Defendant no fewer than 25 times to remove certain caps on her ability to "claim" Panda patients on Zoho, in order to allow her to authorize more than 50 orders per day, which was the limit Panda had placed on providers. *See* Exhibit 8 (GX 739 - 2019.08 to 2020.11 Text Messages Between M. Stein and E. Hernandez), pp. 9–36.  In addition, the Government will elicit testimony at sentencing that will establish that Defendant had access to the Zoho data portal that showed the extraordinary speed and volume of Hernandez' ordering.

Besides the speed and volume of Hernandez's genetic testing orders, which made the fraud in this case obvious, STEIN received text messages and emails providing him with explicit confirmation that Hernandez was not properly authorizing the tests nor calling the patients.  On July 15, 2020, Hernandez herself sent Defendant a picture of a letter she had received from United Healthcare which listed eight patients and stated "The above members indicated that they did not have a telehealth visit with you on the above dates of service."  Ex. 9, pp. 9-10.  That same day,

Defendant emailed that picture to Panda personnel, requesting copies of those patients' consent forms. Exhibit 9 (GX 661 - 2020.07.15 Email from M. Stein to TechSupport@healthawarenessproject.org re: Telemed Consent Needed). On July 24, 2020, Defendant sent an email to A.J., an unknown individual who may have been one of Defendant's employees or agents, directing her to call beneficiaries to let them know a doctor had authorized their test and their kits would be sent in the mail. *See* Exhibits 10-11 (GX 663 and GX 663A - 2020.07.24 Email from M. Stein to A.J. re: Login Info). Co-conspirator Geraldes testified at his deposition that he understood this effort to be an attempt to reduce confusion and complaints from beneficiaries who were receiving kits despite never having spoken to a medical provider about their tests. *See, e.g.*, Geraldes Dep. 129:5–8, 131:12–22, 132:5–9, 16–25, 133:1–3, 134:14–25, 135:1–5.

The evidence therefore conclusively shows that, as of at least July 2020, and actually well before that, Defendant was aware that Hernandez was not calling patients prior to authorizing their tests. Yet, far from attempting to mitigate her misconduct, Defendant and his co-conspirators continued to allow Hernandez to authorize tests for thousands of Panda patients, and even reassigned patients to her to ensure their orders would be authorized more speedily. *See* Exhibit 12 (GX 746 - 2020.09.14 Text Messages Between M. Stein and HAP Telemed Employees). Defendant did this knowing that her orders would result in medically unnecessary, fraudulent claims to Medicare. Defendant did this because he understood that Panda was paying him to arrange for providers who would sign orders, and Hernandez was willing to do exactly that.

Because Defendant knowingly solicited kickbacks in exchange for arranging for providers to authorize Panda's testing orders for the entire relevant time period, all payments for claims authorized by the providers Defendant recruited must be included in his loss calculation, as stated

in the PSR.  At the very least, any orders signed by Hernandez in or after July 2020, when Defendant doubtlessly knew that Hernandez was not calling her patients, must be included in the loss calculation at sentencing, which results in an identical Guidelines range to the one recommended in the PSR.[5]

3. **Defendant's Efforts to Conceal the Nature of His Work Through a Sham Contract Is Further Evidence of His Knowledge and Intent, and There Is No Viable Advice of Counsel Defense in This Case.**

In or around April 2020, Defendant entered into a sham agreement with Panda.  The agreement stated Defendant was to provide certain "consultation and IT services" to Panda, but did not disclose that he would be recruiting providers, offering them access to Panda's patients, and in return requiring the providers to refer any genetic tests ordered for those patients back to Panda's laboratories.  *See* Exhibit 14 (GX 502 - 2020 Master Services Agreement).  Although Defendant provided limited IT-related services to Panda, he did not provide the major services listed in the contract, such as a portal for electronic medical records and electronic prescribing software, and yet Panda continued to pay him.

As Panda co-owner and co-conspirator Geraldes testified during his deposition, Panda paid Stein because he was performing the actual job they had hired him to do: arranging for the referral of orders to Panda's laboratories.  Geraldes Dep. 151: 7–23, 152:3–6 ("Q. Panda would not have continued to pay Mr. Stein that $50,000 a month if he had provided a portal and no telemedicine providers? A. That's correct.  Q. And Panda would not have continued to pay Mr. Stein if he had found providers, but those providers didn't sign the orders? A. That's correct. . . . Q. And Panda

---

[5]     Medicare paid approximately $26,713,766 for genetic tests performed at Panda's laboratories that were authorized by Elizabeth Hernandez in or after August 2020.  Exhibit 13 (GX 111 - Medicare Claims Data Summary Amerihealth Laboratory and MP3 Labs Genetic Tests, Elizabeth Hernandez – Ordering/Referring Practitioner.)  Consequently, even if Defendant was held responsible for only Hernandez' orders after July, when he undoubtedly knew Hernandez was not calling patients, that would result in an identical +22 for loss under U.S.S.G. § 2B1.1(b)(1)(L).)

would not have continued to pay Mr. Stein if the providers sent the signed orders to a different laboratory that wasn't owned by Panda? A. That's correct.").

In his Objections to the PSR, Defendant repeatedly refers to legal advice that Panda's lawyers, specifically Chris Reed of Weaver Johnston & Nelson, provided to Panda, suggesting that Mr. Reed approved the work he did for Panda. *See, e.g.*, Ex. 1, pp. 8, 13 ("[I]t was attorney Chris Reed's legal opinion that practitioners should bill Medicare directly for their services, so Stein believed this structure was compliant. . . Chris Reed provided this advice and approved the use of telemedicine in Panda's model . . . Chris Reed approved the business structure and it was Reed's idea to have the telehealth practitioners bill Medicare.")  This argument implies that Mr. Reed was fully informed of the true nature of Defendant's services for Panda, when, in fact, the opposite is true.  In a declaration signed June 9, 2023, Mr. Reed states "During my representation . . . I never approved for execution any contract with Defendant Michael Stein . . . .  While I redlined the contract, I also had a series of questions related to the terms of the contract and specific services being provided that were never answered but were required to complete the redlining of the contract. . . .  During the time that I worked on this representation, I was not aware of any agreement or expectation that Defendant Stein would be paid or otherwise compensated in any way to recruit doctors who, in turn, were required to refer patients back to the company, nor did I approve the legality or otherwise provide legal counsel regarding any such referral arrangement.").  Exhibit 15 (GX 929 - C. Reed Declarations).  Indeed, Defendant's own email communications show that when Mr. Reed asked questions about the services Defendant would be providing, writing "I am also unclear as written whether the company is merely providing Panda a software platform for the use by teledoctors OR if the company is providing Panda both teledocs and the software platform," Defendant responded by "remov[ing] any references to telemed/doctors."  Exhibit 16

(GX 625 - 2020.03.31 Email from M. Stein to L. Palatnik re: read).  Even if Mr. Reed had been aware that Defendant's company was being paid to provide "teledocs," Mr. Reed was never asked to and never approved having "teledocs" like Hernandez authorize tests at such a high daily volume that no meaningful consultation or assessment could realistically take place.

In his Objections, Defendant justifies the sham contract by repeatedly noting that he did, in fact, provide Panda with certain IT services, "including the development of a HIPAA-compliant virtual private network, a Nextiva platform for telehealth practitioners to call / video patients, and technical support for the telehealth practitioners navigating Panda's customer relationship management software," and that he complied with his contractual agreement to "make available" a software platform to Panda, since he was "ready, willing, and able to further develop a software platform per the MSA." Ex. 1, p. 4.  In truth, Defendant never provided, nor intended to provide, any software service that could conceivably be reasonably valued at $50,000 per month.  The evidence shows that, between April and December 2020, Defendant's company, 1523 Holdings, received deposits totaling approximately $545,483, $400,100 of which came from Panda's payments.  Exhibit 17 (GX 140 - Total Deposits into 1523 Holdings, LLC April 2020 – December 2020).  Approximately $391,599 of that total was transferred directly to Defendant's personal account as profit.  Exhibit 18 (GX 141 - Expenses for 1523 Holdings, LLC April 2020 – December 2020).  1523 Holdings' primary expense during that period was $65,320 in payments to Lifeline Recruiting, the company that identified the providers that Defendant brought into the scheme.  There were no major software or IT related expenditures in the company's bank records, and invoices sent to Defendant by Nextiva suggest that he paid only approximately $27.95 per month for Nextiva's services.  *See e.g.*, Exhibit 19 (GX 930 - 2020.08.07 Nextiva Invoice).

Defendant maintains that he believed he was being paid an average of $50,000 per month, more than six times his salary at his full-time IT job, and more than twice what Panda's Chief Financial Officer and highest-paid employee earned, to provide a service that cost him $30 per month, and to stand ready to "make available" a software that Panda already had in place.  Exhibit 20 (GX 144 - Monthly Payments from Panda Conservation Group, LLC to 1523 Holdings, LLC vs. Payments from Naixin Furniture, Inc. to Michael Stein vs. Individuals Identified in Payroll Journal as IT April 2020-December 2020); Geraldes Dep. 103:10-22, 104:8-21.[6]  This beggars belief.  Defendant knew Panda was paying him to arrange for providers to authorize orders, and he knew it from the start of the conspiracy.  He is therefore liable for the entire loss incurred by Medicare during that period.

### III.    The PSR Accurately Sets Out the Restitution Amount.

The Government recommends joint and several restitution in the amount of $61,319,276.98, which represents the amount paid by Medicare over the course of the fraud scheme made possible by the actions of the Defendant.

---

[6]   Q. And Panda already at that time in 2020 had Zoho in place?
A. In April? Yes, I believe so.
…
Q. And neither Mr. Lundberg, nor Mr. Zito, nor Mr. Viglione [staff in Panda's IT department] made $50,000 a month, did they?
A. No.
Q. They made a lot less; right?
A. Yes.  I think it was eight to 10,000.
Q. . . . [Y]ou mentioned earlier your CFO, Mr. Hajela. He was the highest paid person at Panda; is that right?
A. Correct.
Q. And he made about $20,000 a month?
A. Yes.
Q. And that's less than half of what Mr. Stein was going to be making for working on this purported portal?
A. Correct.

**IV.     A Minor Role Adjustment Should be Denied.**

A minor role adjustment is not appropriate here, where Defendant played an integral role in the conspiracy for which he has pled guilty.  Defendant accepted over $400,000 in kickbacks in exchange for arranging for thousands of orders to be signed for Panda during the conspiracy time period.  He was the direct liaison between Panda and the providers who signed those orders, and in regular contact with Elizabeth Hernandez, who signed the vast majority of them.  He was well aware that she was signing an impossible number of orders each day, and that those orders would be billed to Medicare.  He trained the providers on how to use Panda's platform, indicating to them that the process was quick, and implementing no safeguards to ensure that the providers were actually conducting appropriate consultations.  He did so knowing that he was offering each of these providers a valuable opportunity to bill Medicare for patients they otherwise had no connection to, and that those providers would, in exchange, be required to refer any orders back to Panda's laboratories.  He was vital to the scheme, and central to the fraud.

Pursuant to Section 3B1.2, a defendant may receive a three to four reduction in his base offense level where his role in the offense was minor or minimal.  *See* U.S.S.G. § 3B1.2.  The adjustment is intended to "cover defendants who are plainly among the least culpable of those involved in the conduct of a group.  Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant."  U.S.S.G. § 3B1.2, n.4.  In determining a defendant's role in the offense, a court must examine "(1) the defendant's role in the relevant conduct for which he has been held accountable at sentencing; and (2) his role as compared to that of other participants

14

in his relevant conduct." *United States v. Baron*, 284 Fed. App'x 781, 784 (11th Cir. 2008) (citing *United States v. De Varon*, 175 F.3d 930, 940 (11th Cir. 1999)).

Defendant argues that he did not learn about "any improper billing until the end of the conspiracy period." The evidence shows this is simply not credible. Defendant was at the center of the scheme, connecting Panda to each and every provider who authorized orders for their laboratories. He understood those orders would be used to bill Medicare. He also understood that he was being paid to ensure that the providers he found would authorize these orders quickly and in large numbers; he admitted to Geraldes that he actively worked to ensure that only providers willing to do this continued to work with him. He was involved in efforts to reassign patients whose orders weren't signed quickly enough to Hernandez, who could be counted on to sign high volumes quickly. He was in constant communication with Hernandez, and knew how many orders she was signing. He signed a contract that he knew did not accurately set out the services he was planning to perform in order to conceal the nature of his true work from Panda's attorneys. Defendant had no blind spots – he was aware and involved in every step of the way.

The Court should accordingly overrule Defendant's objections, find that the PSR properly calculates Defendant's offense level of 28, and find that no minor role adjustment is warranted.

## V.    A SIGNIFICANT DOWNWARD VARIANCE IS UNWARRANTED.[7]

---

[7]        Although Defendant has not yet filed a Sentencing Memorandum, the Government expects that he may request a downward variance on the basis of a pending amendment to U.S.S.G. § 4C1.1. This Court is required to apply the version of the Guidelines in effect at the time of sentencing. *See* 18 U.S.C. 3553(a)(4)(A)(ii); U.S.S.G. § 1B1.11(a). Unless Congress provides otherwise, a proposed Guidelines amendment takes effect only after a prescribed period of congressional review has elapsed. *See* 28 U.S.C. 994(p); *Stinson v. United States*, 508 U.S. 36, 41 (1993) ("Amendments to the Guidelines must be submitted to Congress for a 6-month period of review, during which Congress can modify or disapprove them."). In this instance, absent Congressional action, the amendment will not take effect until November 1, 2023. If the Court is inclined to consider the 2-level reduction before it takes effect, the Court must calculate the Guidelines range under the current version of the Guidelines first. Then, the Court may vary downward, in light of the proposed amendment. If the Court varies downward, the Government asks that the Court clearly state that the variance is as a result of the amendment so that Defendant will not receive a further reduction if the Sentencing Commission subsequently makes the amendment retroactive. The Government also notes

Once the Guidelines are properly calculated, the Court must determine the appropriate sentence after considering the factors set forth in 18 U.S.C. § 3553(a). *United States v. Howard*, 28 F.4th 180, 204 (11th Cir. 2022) (citing *United States v. Rosales-Bruno*, 789 F.3d 1249, 1253–54 (11th Cir. 2015)). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to afford adequate deterrence; (3) the kinds of sentences available; (4) the sentencing range, (5) policy statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution. *See* 18 U.S.C. §3553(a).

Although the Sentencing Guidelines are advisory, a major variance from the Guidelines range "should be supported by a more significant justification than a minor one," and a court must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall v. United States*, 552 U.S. 38, 50 (2007); *see also United States v. Irey*, 612 F.3d 1160, 1196 (11th Cir. 2010) (*en banc*) ("Although there is no proportionality principle in sentencing, a major variance does require a more significant justification than a minor one . . . .").

The Government realizes that Defendant has no prior criminal history, and may suffer from a psychological condition. But the Government's dismissal of all counts except Count 1 of the Indictment, which results in Defendant being capped at a maximum sentence of 60 months (18 months below the low end of the applicable Guidelines), addresses these factors and already reflects a significant downward variance that accounts for Defendant's personal characteristics and

---

that application of the 2-level variance would result in a range of 63 to 78 months, which remains above the statutory maximum, and therefore ultimately does not affect our recommendation.

circumstances. Defendant's request for any further downward variance, including any that would result in a non-custodial sentence, should be denied. Objections at p. 17. In this case, the Section 3553(a) factors, in particular the seriousness of the offense and the need for deterrence, weigh in favor of a custodial sentence of the statutory maximum 60 months. Such a sentence would be "sufficient, but not greater than necessary" to comply with the purposes enumerated in Section 3553.

Although this is Defendant's first offense, there are important countervailing factors that weigh against his request for a noncustodial sentence. First, although Defendant is a first-time offender, his first crime is a serious one: he conspired to defraud Medicare out of over $60 million in just 8 months. Second, Defendant's acceptance of responsibility has already been considered in the PSR's recommended Guidelines' range. Third, Defendant's sentence must be sufficient to deter not only him, but others, from undertaking similar schemes in the future. For those reasons, a sentence of 60 months is appropriate.

### A. The Nature and Circumstances of the Offense

The crime committed by Defendant is undoubtedly serious. Defendant conspired with others to commit a substantial fraud, and the success of the fraud hinged on Defendant's recruitment of medical professionals to participate in the scheme. This fraud exploited regulatory flexibilities on the use of telemedicine enacted to provide needed access to care for some of our most vulnerable citizens during a global pandemic. Over the course of just eight months, Defendant's actions resulted in over $60 million worth of fraudulent genetic testing orders, all of which were procured by the payment of kickbacks. In addition, the vast majority of these orders were signed by Elizabeth Hernandez, a provider who Defendant certainly knew was signing orders *en masse* and often not speaking to the Medicare beneficiaries for whom the tests were ordered.

17

Defendant knew that his co-conspirators would use the orders he helped them procure to submit fraudulent genetic testing claims to Medicare. In short, he conspired to steal more than $60 million from a Federal health care program designed to provide health care coverage to some of the most vulnerable among us, our nation's elderly and disabled. Defendant's willful, knowing, and wrongful conduct was grave, and Defendant cannot challenge its seriousness.

This factor weighs heavily in favor of a significant custodial sentence.

### B. Defendant's History and Characteristics

Defendant asks that the Court consider his history and personal characteristics, in particular his lack of any criminal history and potential psychological condition. The Government does not dispute Defendant's professional and personal achievements, and understands the difficulties his family may face as a result of his incarceration. However, those circumstances do not, on their own, support a substantial downward variance. Rather, a sentence that is already capped 18 months below the applicable Guidelines range appropriately addresses Defendant's relevant personal characteristics.

### C. Promote Respect for Law and Provide Just Punishment

A custodial sentence of 60 months would promote respect for the law and provide just punishment. Defendant committed a serious crime, one that involved repeated lies to Medicare, and attempts to conceal misconduct, and led Medicare to pay out over $60 million for tests that were medically unnecessary and ineligible for reimbursement. The serious crime requires a serious punishment.

### D. Need to Deter Future Criminal Conduct

A substantial sentence within the Government's recommended range is necessary to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). As this Court is

well aware, health care fraud is rampant in South Florida..  The Eleventh Circuit has specifically commented on the special need for deterrence in cases like this:

> [D]eterrence is an important factor in the sentencing calculus because health care fraud is so rampant that the government lacks the resources to reach it all.  Thus, when the government obtains a conviction in a health care fraud prosecution, one of the primary objectives of the sentence is to send a message to other health care providers that billing fraud is a serious crime that carries with it a correspondingly serious punishment.

*United States v. Kuhlman*, 711 F.3d 1321, 1328 (11th Cir. 2013).  That rationale applies with equal force in this case, which illustrates the ways that fraudsters can seek to exploit times of crisis to increase profits.  While Defendant may be sincere in his commitment to obey the law going forward, his actions require a just and reasonable punishment that will serve to deter others from engaging in similar misconduct.

### E.  Need to Avoid Unwarranted Disparities

Three of Defendant's co-conspirators have been sentenced in connection with this scheme. The first, Panda co-owner Leonel Palatnik, was sentenced by this Court to 82 months for his role in the conspiracy.  *United States v. Stein*, No. 21-CR-20321-ALTONAGA, D.E. 68 (S.D. Fla. Nov. 10, 2021).  The second, Panda co-owner Gustavo Geraldes, was sentenced to 28 months for his role in a more limited time period of the conspiracy, which resulted in approximately $8.8 million in fraudulent payments.  *United States v. Geraldes*, No. 22-cr-20141-RNS, D.E. 77 (S.D. Fla. Nov. 18, 2022).  Co-conspirator Dr. Omar Saleh was sentenced to 16 months for his role in the conspiracy, which caused $1,629,330.48 in loss.  *United States v. Saleh*, No. 22-CR-20317-BLOOM (S.D. Fla. May 12, 2023).

While Geraldes received a sentence well below the Government's recommendation of 57 months, he was aware of the misconduct at Panda for approximately one month, and made a voluntary self-disclosure to the Government.  As a result, he was held responsible for only the

subset of loss caused during the time when he was a knowing participant in the conspiracy. Palatnik, on the other hand, was sentenced to 82 months because he participated in the scheme from the start and was therefore responsible for the entire loss incurred.  Defendant is similarly situated to Palatnik in terms of his knowledge, and both Palatnik and Defendant kept Geraldes and others from knowing the full extent of the scheme, particularly Hernandez' central role in it. Indeed, no one dealt more directly with Hernandez than Defendant.  This weighs in favor of at least a comparable sentence for Defendant, who was also a knowing participant from the start.

## **CONCLUSION**

For the foregoing reasons, the United States respectfully submits that a sentence of 60 months of imprisonment is sufficient, but not greater than necessary, to provide just punishment to Defendant for his crime, promote respect for the law, and deter Defendant and others from committing similar crimes in the future.

Dated: June 15, 2023                              Respectfully submitted,

                                                  MARKENZY LAPOINTE
                                                  UNITED STATES ATTORNEY
                                                  SOUTHERN DISTRICT OF FLORIDA

                                                  GLENN S. LEON
                                                  CHIEF, FRAUD SECTION
                                                  CRIMINAL DIVISION
                                                  DEPARTMENT OF JUSTICE

                                   By:            */s/ James V. Hayes*
                                                  JAMES V. HAYES
                                                  FL Special Bar No. A5501717
                                                  Senior Litigation Counsel
                                                  LIGIA MARKMAN
                                                  Trial Attorney
                                                  FL Special Bar No. A5502656
                                                  United States Department of Justice
                                                  Criminal Division, Fraud Section
                                                  1400 New York Avenue, N.W.
                                                  Washington, D.C. 20005
                                                  Telephone: (202) 794-2219
                                                  James.Hayes@usdoj.gov
                                                  Ligia.Markman@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on June 15, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

<u>*Ligia M. Markman*</u>
Ligia M. Markman